25-1144-cv
*Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of N.Y., Bd. of Governors of the Fed. Rsrv.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————

August Term 2025

(Argued: January 29, 2026     Decided: May 13, 2026)

Docket No. 25-1144-cv

———————

BANCO SAN JUAN INTERNACIONAL, INC.,

*Plaintiff-Appellant,*

*- against -*

THE FEDERAL RESERVE BANK OF NEW YORK,
THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,

*Defendants-Appellees.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

———————

Before:

SACK, CHIN, AND LOHIER, *Circuit Judges.*

———————

Appeal from orders and final judgment of the United States District Court for the Southern District of New York (Koeltl, *J.*) dismissing all claims brought by a Puerto Rican "International Banking Entity."  After its Master Account at a regional Federal Reserve Bank was terminated, the International Banking Entity brought suit against the Reserve Bank and the Board of Governors of the Federal Reserve System, alleging that it was statutorily entitled to an account under the Federal Reserve Act.  The district court held, *inter alia*, that the statute did not create a nondiscretionary entitlement to a master account, and dismissed all claims under federal and state law pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

AFFIRMED.

---

CARTER G. PHILLIPS, Sidley Austin LLP, Washington, D.C., and Kelly A. Librera, Matthew D. Olsen, Winston & Strawn LLP, New York, New York; Abbe D. Lowell, Lowell & Associates, PLLC, Washington, D.C., *on the brief, for Plaintiff-Appellant Banco San Juan Internacional, Inc.*

JONATHAN K. YOUNGWOOD (Meredith D. Karp, *on the brief*), Simpson Thacher & Bartlett LLP, New York, NY, and Michael M. Brennan, Michele Kalstein, Federal Reserve Bank of New York,

New York, NY, *on the brief, for Defendant-Appellee Federal Reserve Bank of New York.*

JOSHUA P. CHADWICK (Mark Van Der Weide, Richard M. Ashton, Nicholas Jabbour, *on the brief*), Board of Governors of the Federal Reserve System, Washington, D.C., *for Defendant-Appellee Board of Governors of the Federal Reserve System.*

Anthony O. Maceira Zayas, Mabel Sotomayor Hernández, MZLS LLC, San Juan, P.R., *for Amicus Curiae* Senate of Puerto Rico, *in support of Plaintiff-Appellant.*

---

CHIN, *Circuit Judge*:

For over a century, regional Federal Reserve Banks ("Reserve Banks") have provided payment services to banks and other depository institutions across the country. Reserve Banks -- which are the operating arms of the nation's central bank, the Federal Reserve System (the "Fed") -- facilitate the flow of trillions of dollars through the U.S. financial system, collectively processing about $4.5 trillion in wire transfers,[1] $188 billion in commercial

---

[1] *See Fedwire Funds Service - Annual Statistics*, Fed. Rsrv. Bank Servs. (Jan. 26, 2026), https://www.frbservices.org/resources/financial-services/wires/volume-value-stats/annual-stats.html [https://perma.cc/SPP8-UKZP].

automated clearinghouse transactions,[2] and $33 billion in commercial checks on a daily basis.[3]  All of these transactions are effectuated through master accounts, which are the critical financial arrangement through which banks and other depository institutions transact with each other, their customers, and the federal government.  Master accounts have accordingly been aptly described as "bank account[s] for banks." *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 861 F.3d 1052, 1053 (10th Cir. 2017) (Moritz, J.).

This case is the latest in a series of challenges over master account access brought by nontraditional banking institutions.  Challenges have been brought by, for example, a credit union serving cannabis businesses,[4] a financial technology payment processor for foreign transactions,[5] and a cryptocurrency

---

[2]     *See Commercial Automated Clearinghouse Transactions Processed by the Federal Reserve -- Annual Data*, Bd. of Governors of the Fed. Rsrv. Sys. (Feb. 26, 2026), https://www.federalreserve.gov/paymentsystems/fedach_yearlycomm.htm [https://perma.cc/T4KY-6RHX].

[3]     *Commercial Checks Collected Through the Federal Reserve -- Annual Data*, Bd. of Governors of the Fed. Rsrv. Sys. (Feb. 26, 2026), https://www.federalreserve.gov/paymentsystems/check_commcheckcolannual.htm [https://perma.cc/L5LU-HSFY].

[4]     *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 154 F. Supp. 3d 1185, 1187 (D. Colo. 2016), *vacated*, 861 F.3d 1052 (10th Cir. 2017).

[5]     *PayServices Bank v. Fed. Rsrv. Bank of S.F.*, No. 1:23-CV-00305-REP, 2024 WL 1347094, at *4 (D. Idaho Mar. 30, 2024); *appeal pending*, No. 24-2355 (9th Cir.).

custody bank.[6]  In each case, the governing Reserve Bank evaluated the institution's request for a master account and rejected it, thereby barring the institution from directly accessing the Fed's payment services.

The plaintiff before us is an International Banking Entity ("IBE") operating under an offshore bank charter pursuant to Puerto Rican law.  *See* P.R. Laws Ann. tit. 7, §§ 232c, 232j (2011).  Plaintiff-Appellant Banco San Juan Internacional, Inc. ("BSJI") opened a master account (the "Master Account") with the Federal Reserve Bank of New York (the "FRBNY"), but then had the Master Account closed by the FRBNY as a consequence of alleged noncompliance with certain anti-money laundering safeguards.  BSJI challenged the closure, arguing that it had a statutory entitlement to its Master Account under the Federal Reserve Act (the "FRA"), 12 U.S.C. § 221 *et seq.*, as amended by the Monetary Control Act (the "MCA"), Pub. L. No. 96-221, 94 Stat. 132 (1980).  BSJI brought claims against the FRBNY and the Board of Governors of the Fed (the "Board," and, together with the FRBNY, "Defendants") under the Administrative Procedure Act (the "APA"), the Mandamus Act, the Declaratory Judgment Act

---

[6]    *Custodia Bank, Inc. v. Fed. Rsrv. Bd. of Governors*, 157 F.4th 1235, 1244 (10th Cir. 2025).

(the "DJA"), the Fifth Amendment Due Process Clause, and New York state contract law.

After denying BSJI's request for a preliminary injunction, the district court granted the FRBNY and the Board's motions to dismiss, and later denied BSJI's motion to add another APA claim and a Fifth Amendment Equal Protection claim. It then entered judgment dismissing BSJI's amended complaint and denying leave to amend.

We conclude that BSJI does not have a statutory entitlement to a master account under the Federal Reserve Act. Because BSJI's federal law claims turn on the existence of a nondiscretionary obligation on the part of the FRBNY, they were properly dismissed. We further conclude that BSJI does not have constitutional standing to assert its claims against the Board, it has failed to plausibly plead its contract claims under New York state law, and its proposed Equal Protection claim is futile. Accordingly, we AFFIRM the judgment of the district court.

## BACKGROUND

### I.     The Federal Reserve System[7]

The Fed was established in 1913 pursuant to the FRA, and is composed of its Board of Governors, the Federal Open Market Committee, and twelve regional Reserve Banks.  The Reserve Banks are incorporated as private corporations owned by private shareholders, *see* 12 U.S.C. §§ 282, 321; *United States ex rel. Kraus v. Wells Fargo & Co.*, 943 F.3d 588, 597 (2d Cir. 2019), and are statutorily authorized to provide banking services -- such as holding deposits, issuing loans, facilitating wire and automated clearing house transfers, and settling transactions -- to banks and to the federal government, *see* Fed. Rsrv. Sys., *The Fed Explained: What the Central Bank Does* 86-87 (11th ed. 2021); *Financial Services*, FRBServices.org, https://www.frbservices.org/financial-services [https://perma.cc/G3H6-R99P].

---

[7]     The facts in this section are either undisputed or drawn from the relevant statutory text and legislative history, of which we may take judicial notice.  *See Goe v. Zucker*, 43 F.4th 19, 29 (2d Cir. 2022).

- 7 -

## A.        Reserve Banks and Master Accounts

Banks and other depository institutions[8] access Reserve Bank services by holding a master account, which is a deposit account held and administered by the Reserve Banks into which the owner can make deposits and from which it can make withdrawals.  To be statutorily eligible for such an account, a depository institution must be chartered under federal, state, or territorial law, and be "engaged in the business of receiving deposits."  12 U.S.C. § 1813(a).

When the Fed was created in 1913, direct access to its payment services was limited to "member banks" -- national or state-chartered banks that purchased stock in their regional Reserve Bank and were subject to the Fed's regulatory oversight.  *See id.* §§ 221-223; 12 C.F.R. §§ 209.1-209.5.  Member banks could access the Fed's services for free, but had to maintain a certain amount of non-interest-bearing reserves at their respective Reserve Bank.  *See* Federal

---

[8]        The term "depository institutions" includes banks, savings associations, and credit unions.  *See* 12 U.S.C. § 461(b)(1).  Because BSJI is a "State bank" chartered under the laws of Puerto Rico as defined in 12 U.S.C. § 1813(a), we use the terms "bank" and "depository institution" interchangeably in this opinion.

Reserve Act, Pub. L. No. 63-43, §§ 2, 19, 38 Stat. 251, 252, 270 (1913).[9]  By contrast,

nonmember banks could only indirectly access the Fed's services by keeping

reserves with correspondent member banks that charged for payment services.

This regime changed with the passage of the MCA in 1980.  The

MCA was a legislative response to two sources of mounting market pressure.

First, novel financial institutions like credit unions and thrifts were becoming

more popular, but had to pay correspondent banks to access the same Fed

services that member banks were provided for free, causing concern that the Fed

was undercutting its private competitors.  Second, the Fed was experiencing

what its then-Chairman described as an "avalanche in [the] loss of members" as

rising interest rates increased the cost to member banks of holding the required

amount of non-interest-bearing reserves.  *Federal Reserve Requirements: Hearings*

*on S. 353 and Proposed Amendments, S. 85, and H.R. 7 Before the S. Comm. on*

*Banking, Hous., & Urb. Affs.*, 96th Cong. 5-6 (1980) (statement of Paul A. Volcker,

Chairman, Bd. of Governors of the Fed. Rsrv. Sys.); *see also Monetary Control and*

*the Membership Problem: Hearings on H.R. 13476, H.R. 13477, H.R. 12706, and H.R.*

---

[9]     Historically, the reserve requirement was a critical monetary policy tool, allowing the Fed to control available money supply, which in turn affects interest rates. *See The Fed Explained*, *supra*, at 36, 40, 42.

*14072 Before the H. Comm. on Banking, Fin. & Urb. Affs.*, 95th Cong. 80 (1978) (statement of G. William Miller, Chairman, Bd. of Governors of the Fed. Rsrv. Sys.).

Congress responded to these concerns by enacting a two-fold solution in the MCA.  First, the MCA made nonmember banks statutorily eligible for Reserve Bank services, *see* 12 U.S.C. § 342, but subjected them to the Fed's reserve requirements, *id.* § 461(b)(2)(D).  This would increase reserves and the Fed's corresponding influence over monetary policy while mitigating the "avalanche" of membership loss.  Second, and in parallel, the Fed would begin charging both member and nonmember banks for its payment services.  *Id.* § 248a(a).  The Board would set a uniform fee schedule that covered the full costs of providing such services "[o]ver the long run," *id.* § 248a(c)(3), thereby placing the Fed in "direct competition" with private payment services providers, *The Role of the Federal Reserve in Check Clearing and the Nation's Payments System: Hearings on S. 573 Before the Subcomm. on Com., Consumer & Monetary Affs. of the H. Comm. On Gov't Operations & the Subcomm. on Domestic Monetary Pol'y of the H. Comm. On Banking, Fin. & Urb. Affs.*, 98th Cong. 2 (1983) (statement of Sen. Doug

- 10 -

Barnard, Jr., Chairman, Subcomm. on Com., Consumer & Monetary Affs. of the

H. Comm. on Gov't Operations).

As was true before the MCA, banks today access the Fed's payment

services through an account at a Reserve Bank. While some banks originally had

accounts with several Reserve Banks, banks have, since 1998, accessed the Fed's

services through a single master account. *See* Julie Andersen Hill, *Opening a*

*Federal Reserve Account*, 40 Yale J. on Regul. 453, 462 (2023). To open a master

account, banks execute a Master Account Agreement ("MAA"), which has, since

1998, incorporated by reference Operating Circular 1 ("OC 1"), a standard policy

that sets forth the terms under which eligible banks may open, maintain, and

terminate an account. *See* Fed. Rsrv. Bank of Dall., *Federal Reserve Standardized*

*Operating Circulars*, Notice 97-104 (Nov. 12, 1997), https://fraser.stlouisfed.org/

title/district-notices-federal-reserve-bank-dallas-5569/federal-reserve-

standardized-operating-circulars-546823 [https://perma.cc/SH6Y-KJC9] (first OC

1, effective January 1998) (hereinafter "OC 1 (1998)");[10] Fed. Rsrv. Fin. Servs.,

*Operating Circular No. 1: Account Relationships* 1 (2023),

---

[10]     The first uniform OC 1 was adopted by the FRBNY in September 1997 and went
into effect in January 1998. *See* Fed. Rsrv. Bank of N.Y., *New Operating Circulars*,
Circular No. 10985, https://www.newyorkfed.org/banking/circulars/10985.html#List
[https://perma.cc/XBC2-HP3U].

https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/090123-operating-circular-1.pdf [https://perma.cc/HYC6-RMJ6] (most recent OC 1, effective September 2023). OC 1 grants the Reserve Bank the right to terminate a bank's master account "at any time by notice to the Account Holder." Conf. App'x at 1583. Some high-risk master account holders agree to additional enhanced risk-mitigation requirements, which are typically codified in supplemental agreements or policies specific to a regional Reserve Bank.

The Fed and other federal banking regulators maintain significant supervisory authority over Fed member banks.[11] This supervisory authority includes the ability to access member banks' books and records, 12 U.S.C. § 248(a), conduct on-site examinations, *id.* § 325, and take various enforcement actions, including issuing cease-and-desists, removal orders, and civil penalties, *id.* §§ 504, 1818; *see Enforcement Actions,* Bd. of Governors of the Fed. Rsrv. Sys. (Jan. 15, 2025), https://www.federalreserve.gov/supervisionreg/enforcement-

---

[11] The federal regulator to which a member bank is subject depends on whether the institution is chartered at the federal or state level. State chartered member banks are supervised by the Board, *see* 12 U.S.C. § 1813(q)(3)(A), while federally chartered national banks are supervised by the Office of the Comptroller of the Currency (the "OCC"), part of the U.S. Department of the Treasury, *see id.* §§ 1, 21, 481.

actions-about.htm [https://perma.cc/8CUV-PQLE]. These supervisory powers do not extend to nonmember banks, even those that hold a master account.[12]

Today, banks that do not hold their own master account can still access the Fed's services through a correspondent banking relationship. Alternatively, they may pay a private provider for these payment services.

### B. The Board

While the Reserve Banks are privately owned corporations, the Board is an independent agency whose seven governors are nominated by the President and confirmed by the Senate. The Board "exercise[s] general supervision" over the Reserve Banks, including by supervising their provision of payment services through the promulgation and issuance of regulations, statements, and guidance documents. 12 U.S.C. § 248(j); *see* Bd. of Governors of the Fed. Rsrv. Sys., 111th Annual Report of the Board of Governors of the Federal Reserve System 37-40 (2024), https://www.federalreserve.gov/publications/files/2024-annual-report.pdf [https://perma.cc/FR84-SBXM].

---

[12]    Some nonmember banks are still subject to federal prudential supervision, albeit not by the Fed. For example, state-chartered nonmember banks are supervised by the Federal Deposit Insurance Corporation (the "FDIC").

In August 2022, the Board published one such guidance document pursuant to its supervisory authority under § 248(j) titled "Guidelines for Evaluating Account and Services Requests" (the "Guidelines"). 87 Fed. Reg. 51099 (Aug. 19, 2022). Responding to "a recent uptick" in novel types of federal and state-chartered depository institutions and the related increase in the "number of inquiries and access requests" from such institutions, the Guidelines set out six risk-assessment principles for Reserve Banks to consider when reviewing access requests. *Id.* at 51099. Among them, Principle 4 states that provision of an account "should not create undue risk to the stability of the U.S. financial system." *Id.* at 51108. Principle 5 states that provision of an account "should not create undue risk to the overall economy by facilitating activities such as money laundering, terrorism financing, fraud, cybercrimes, economic or trade sanctions violations, or other illicit activity." *Id.* at 51109.

The Guidelines also outline a three-tiered framework for the "level of due diligence and scrutiny to be applied by Reserve Banks to different types of institutions." *Id.* As relevant here, Tier 3 institutions are those that do not have federal insurance and do not have a federal regulator. Account requests by such institutions are subject to the "strictest level of review," in part because they have

- 14 -

no federal prudential regulator and may accordingly "be subject to a regulatory framework that is substantially different" from federally supervised institutions. *Id.* at 51110.[13]  The Guidelines expressly note, however, that "a Reserve Bank has the authority to grant or deny an access request by an institution in *any* of the three proposed tiers."  *Id.* at 51109 (emphasis added).

Finally, the Guidelines instruct Reserve Banks to "engage in consultation" with the Board "on reviews of account and service requests."  *Id.* at 51106.  The Board followed up with an internal guidance memorandum issued in January 2023, S-Letter 2677, directing Reserve Banks to, before communicating any decision, consult with the Board if it was considering denying a master account request made by any institution, or granting a master account to a Tier 3 institution.  Both the August 2022 Guidelines and January 2023 S-Letter are careful to emphasize, however, that "legal eligibility [for a master account] does

---

[13]     Federal prudential regulators include the Board, the OCC, and the FDIC. Guidelines for Evaluating Account and Services Requests, 87 Fed. Reg. at 51109 n.12. Federally insured institutions (defined as Tier 1 institutions in the Guidelines framework), are subject to federal banking regulations. *See id.* at 51109.  Some institutions that do not have federal insurance still have a federal regulator (defined as Tier 2 institutions in the Guidelines framework) -- for example, institutions that are not federally insured but are federally chartered are subject to supervision by the OCC, and those that are not federally insured but are state chartered and have become Fed member banks are subject to supervision by the Board. *See id.* at 51109 n.12.

not bestow a right to obtain an account and services," and that "decisions

regarding individual access requests remain at the discretion of the individual

Reserve Banks." *Id.*; *see also* Conf. App'x at 1651 (S-Letter 2677) ("[T]he Board

recognizes the discretion granted to the Reserve Banks . . . to grant or deny access

requests or to take action on existing access relationships.").

## II. The Facts[14]

### A. BSJI

BSJI is an IBE established under Puerto Rican law. By law, IBEs

cannot service most residents of Puerto Rico. Instead, IBEs were created to

attract foreign capital to Puerto Rico by offering tax-advantaged offshore

banking services to customers outside of Puerto Rico. *See* P.R. Laws Ann. tit. 7,

§§ 232c, 232j (2011).[15] IBEs are licensed and regulated by Puerto Rico's Office of

---

[14] Unless otherwise noted, we draw these facts from BSJI's Amended Complaint, as well as "documents attached to the [C]omplaint as an exhibit or incorporated in it by reference, matters of which judicial notice may be taken, or documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (citation modified) (quoting *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).

[15] Unlike U.S. onshore banks, IBEs can also provide investment banking and brokerage services. *Compare* 12 U.S.C. § 24 (providing that federally chartered banks cannot "underwrite any issue of securities or stock"), *and id.* § 1831a(a)(1) (stating state-chartered banks generally may not engage in activities that are barred for national

the Commissioner of Financial Institutions, which can approve or deny IBE

applications, revoke licenses, and take enforcement action. As state-chartered

institutions without federal insurance and without a federal regulator, IBEs like

BSJI are classified as Tier 3 institutions under the Fed's August 2022 Guidelines.

BSJI was formed as an IBE in 2011 and is headquartered in

Guaynabo, Puerto Rico. It opened its Master Account with the FRBNY in

November 2011. Like all account holders, BSJI executed an MAA that

incorporated OC 1, which stated that the FRBNY could terminate its account "at

any time by notice to the Account Holder." Conf. App'x at 1583; *see also id.* at

1572.

### B. *FBI Raid and Initial Suspension*

On February 6, 2019, the Federal Bureau of Investigation (the "FBI")

searched BSJI's offices in connection with a federal investigation into its

compliance with anti-money laundering laws in its dealings with a customer

based in Venezuela. The Government seized approximately $53 million in funds

and initiated a civil forfeiture action and investigation with respect to BSJI's

---

banks), *with* P.R. Laws Ann. tit. 7, § 232j(a)(9) (permitting IBEs to "[u]nderwrite, distribute, and otherwise trade in securities, notes, debt instruments, drafts and bills of exchange issued by a foreign person for final purchase outside of Puerto Rico").

compliance with the Bank Secrecy Act ("BSA").  Shortly after the raid, the FRBNY

temporarily suspended BSJI's Master Account.  About a year later, the

Government announced that it would return the seized funds and end its

investigation, and that, in return, BSJI had agreed to pay a $1 million fine and

improve its anti-money laundering policies.

Before the FRBNY lifted its suspension on BSJI's Master Account, the

parties executed a set of Supplemental Terms that required BSJI to comply with

an enhanced set of risk-mitigation measures.[16]  The Supplemental Terms

confirmed the FRBNY's right to "suspend or terminate [BSJI's] access to one or

more Financial Services," and to "close [BSJI's] Master Account."  Conf. App'x at

1602.  Mirroring the language of OC 1, the Supplemental Terms permitted the

FRBNY to terminate BSJI's account "at any time by giving written notice to

[BSJI]."  *Id.*; *see also id.* at 1572.

---

[16]     We note that the Amended Complaint and BSJI's briefs on appeal do not contain
reference to the Supplemental Terms.  The district court, however, relied in part on the
Supplemental Terms, which were introduced as part of the FRBNY's opposition to
BSJI's motion for preliminary relief, in deciding that motion and the motions to dismiss.
BSJI does not dispute its execution of the Supplemental Terms or their contents on
appeal, nor does it argue that the district court improperly relied on the Supplemental
Terms in its decision dismissing the Amended Complaint from which it appeals.
Accordingly, while we do not base our decision on the Supplemental Terms, we refer to
them to the extent that they further support our reasoning.

After BSJI agreed to the Supplemental Terms, the FRBNY informed BSJI that it would restore BSJI's master account access in two phases, the second of which would occur if and when the FRBNY was satisfied that BSJI was in full compliance with its requirements for high-risk accounts. This phased process proceeded smoothly for the first year or so: BSJI engaged independent consultants and submitted the requisite compliance reports, and the FRBNY restored the first tier of account services in December 2020.

### C.        *Account Termination*

In July 2022, however, the FRBNY notified BSJI that BSJI had failed to submit certain required compliance assessments, and that it would be closing BSJI's Master Account in September 2022. After BSJI belatedly submitted the missing assessments before the September closure date, the FRBNY suspended the closure while it reviewed them, and then issued several further requests for information.

During this review period, the FRBNY also solicited its internal teams to conduct risk assessments of BSJI. In March 2023, the FRBNY's Compliance Function issued a risk report identifying numerous red flags in

- 19 -

BSJI's operations and concluded that BSJI posed undue risk of facilitating money laundering or other illicit activity under Principle 5 of the Guidelines.

On April 6, 2023, the FRBNY sent an email to the Board notifying it of the FRBNY's intent to terminate BSJI's Master Account. In that email to the Board, the FRBNY attached its internal compliance assessments explaining its basis for the closure. The Board replied on April 12, 2023, stating that it "ha[d] no concerns with [the FRBNY's] application of the Guidelines to BSJI's [access] and with it moving forward with its intended action to terminate BSJI's access based on this analysis." Conf. App'x at 1294.

On April 24, 2023, the FRBNY sent an email to BSJI with the compliance assessments and informed BSJI that its Master Account would be terminated on June 20, 2023. In that email, the FRBNY highlighted the "serious risk concerns" identified by its compliance assessments, including "[l]arge inflows of funds" and "[m]ultiple transactions made in rapid succession to shell companies owned by parties related to BSJI's owner in high-risk jurisdictions"; "[l]arge outflows to individuals and shell companies purportedly related to bond payments that did not align with [] bond documentation"; and over a dozen deficiencies in BSJI's compliance programs. *Id.* at 1298-301 (FRBNY email to

BSJI); *see also id.* at 1546 ¶ 122, 1548-50 ¶¶ 134-39 (quoting and referencing the email).  Based on the "programmatic weaknesses in BSJI's compliance program and the high concentration of high-risk transaction activity," the FRBNY concluded that BSJI posed undue risk under Principle 5, and that this risk could not be mitigated with heightened compliance controls.  *Id.* at 1301.  As a result, the FRBNY informed BSJI that it was "exercising its contractual rights to close [BSJI's] master account . . . upon notice to BSJI under both the Supplemental Terms . . . as well as the applicable operating circulars."  *Id.* at 1298.

In June 2023, the FRBNY notified BSJI that, after reviewing supplemental information provided by BSJI, it was nonetheless moving forward with closing BSJI's account on July 31, 2023.  The FRBNY ultimately closed BSJI's Master Account in November 2023, following, as discussed below, the district court's denial of BSJI's motion for a preliminary injunction in this case, and this Court's denial of an immediate stay.

### III.    *Procedural Background*

On July 25, 2023 -- six days before BSJI's Master Account was scheduled for closure -- BSJI filed suit in the Southern District of New York, seeking, *inter alia,* a temporary restraining order and preliminary injunction to

- 21 -

block the closure. The district court denied BSJI's motion for a preliminary injunction on October 27, 2023, finding that BSJI was unlikely to succeed on the merits and did not otherwise meet the requirements for preliminary relief. *See Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of N.Y.*, 700 F. Supp. 3d 86, 98-105 (S.D.N.Y. 2023). BSJI then filed an interlocutory appeal, which it later withdrew after this Court denied its motion for an immediate stay.

After the FRBNY closed BSJI's Master Account, BSJI filed an Amended Complaint in February 2024, seeking, *inter alia*, a mandamus order to compel reinstatement of its Master Account and $150 million in damages pursuant to the APA, Mandamus Act, DJA, Fifth Amendment Due Process clause, and New York state contract law. Both Defendants moved to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. The district court granted the motions on January 8, 2025, concluding that the FRA did not provide BSJI with "an unqualified statutory right" to a master account, and that the court accordingly lacked subject matter jurisdiction over BSJI's APA, Mandamus Act, and DJA claims. *Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of N.Y.*, 762 F. Supp. 3d 247, 266 (S.D.N.Y. 2025); *see also id.* at 274, 280-82. It further held that BSJI failed to plausibly plead its APA, Due Process,

- 22 -

and state law claims, and that it did not have constitutional standing to assert its claims against the Board. *Id.* at 274, 278-86. It then denied as futile BSJI's motion for leave to further amend its Amended Complaint to add a new APA claim against the Board and a new Fifth Amendment Equal Protection claim against the FRBNY on March 10, 2025, *Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of N.Y.*, No. 23-CV-6414 (JGK), 2025 WL 753768, at *1 (S.D.N.Y. Mar. 9, 2025), and entered final judgment the same day. This appeal followed.

## *DISCUSSION*

The central issue in this case is whether the FRA, as amended by the MCA, grants BSJI a statutory entitlement to a master account such that the FRBNY possesses no discretionary authority to terminate it. Because the FRA does not authorize a private right of action, BSJI instead seeks relief pursuant to the APA, Mandamus Act, DJA, and Due Process Clause. To succeed on these claims, however, BSJI must first establish that the FRBNY has a nondiscretionary obligation to grant BSJI a master account to access the Fed's payment services.

We first address the core statutory issue on which BSJI's federal claims turn, and conclude that the FRA does not create a statutory entitlement to a master account for nonmember depository institutions like BSJI. We then

- 23 -

address BSJI's standing to bring claims against the Board, the various statutory vehicles through which BSJI asserts federal claims against the FRBNY, BSJI's state law contract claims against the FRBNY, and the district court's denial of leave to amend.

We review *de novo* a district court's decision to dismiss for failure to state a claim under Rule 12(b)(6), "construing the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Mazzei v. The Money Store*, 62 F.4th 88, 92 (2d Cir. 2023) (citation modified). On appeal from a district court's dismissal for lack of subject matter jurisdiction under Rule 12(b)(1), including for lack of Article III standing, we review legal conclusions *de novo* and factual findings for clear error. *A.H. by E.H. v. N.Y. State Dep't of Health*, 147 F.4th 270, 276 (2d Cir. 2025). Finally, while we generally review a district court's denial of leave to amend for abuse of discretion, we conduct *de novo* review when the denial is based on a legal conclusion, such as futility. *Balintulo v. Ford Motor Co.*, 796 F.3d 160, 164 (2d Cir. 2015).

- 24 -

## I. *Interpretation of the FRA and MCA*

"When interpreting the meaning of a statutory provision, the best evidence of Congress's intent is the statutory text." *Grajales v. Comm'r*, 47 F.4th 58, 62 (2d Cir. 2022) (citation modified). The "starting point" for statutory interpretation is always the "language of the statute itself." *United States v. Grillo*, 160 F.3d 149, 150 (2d Cir. 1998) (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980)); *accord Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992) ("When the words of a statute are unambiguous, then . . . [the] judicial inquiry is complete." (citation modified)). The plain meaning of statutory text "draws on the specific context in which that language is used." *Williams v. MTA Bus Co.*, 44 F.4th 115, 127 (2d Cir. 2022) (citation modified). "If, upon examination, the text is ambiguous, we look to traditional canons of statutory construction, the broader statutory context, and the provision's history to help resolve the ambiguity." *MSP Recovery Claims, Series LLC v. Hereford Ins. Co.*, 66 F.4th 77, 86 (2d Cir. 2023).

The two statutory provisions that lie at the heart of this dispute are 12 U.S.C. §§ 342 and 248a(c)(2).

Section 342, which codifies § 13 of the FRA as originally enacted in 1913, states: "Any Federal reserve bank may receive from any of its member banks, or other depository institutions, and from the United States, deposits of current funds in lawful money, national-bank notes, Federal reserve notes, or checks . . . ." 12 U.S.C. § 342.

Section 248a(c)(2) was added by the MCA in 1980 as part of a new section titled "Pricing of services." *See id.* § 248a. Section 248a(a) instructs the Board to publish and implement "a proposed schedule of fees . . . for Federal Reserve bank services" in accordance with the section. *Id.* § 248a(a). Section 248a(b) lists a set of Reserve Bank services that "shall be covered" by the fee schedule. *Id.* § 248a(b). Section 248a(c) outlines principles to which the Board should adhere when setting this fee schedule. Among those principles, § 248a(c)(2) states, in full:

> All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks, except that nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks.

*Id.* § 248a(c)(2).

BSJI argues that the first sentence of § 248a(c)(2), which states that services "shall be available" to nonmember banks, means that it is statutorily entitled to a master account, which is required to use those services. The FRBNY and the Board instead emphasize § 342, arguing that its language that Reserve Banks "may receive" deposits grants Reserve Banks the authority to allow or disallow master accounts at their discretion.

### A.      Section 342

We agree with the FRBNY and the Board that § 342 confers to Reserve Banks discretionary authority over master account access, and that this discretionary authority is not disrupted or otherwise abridged by § 248a(c)(2).

By its text, § 342 gives Reserve Banks authority over master accounts, and its language "may receive" makes that authority discretionary. 12 U.S.C. § 342.[17] This discretion is clear based on the plain meaning of "may," century-old Supreme Court precedent, and Congress's awareness of -- and repeated refusal to disturb -- this longstanding interpretation.

---

[17]      The term "master account" did not appear anywhere in § 13 of the original FRA; today, however, master accounts are the only vehicle by which the Reserve Banks can "receive . . . deposits." 12 U.S.C. § 342. Accordingly, the Reserve Banks' power "to open" master accounts is "implied from [their] authority to receive deposits." *Custodia Bank,* 157 F.4th at 1253.

We begin with the text of § 342, which states that any Reserve Bank "may receive . . . deposits."  12 U.S.C. § 342.  The Supreme Court has "repeatedly observed that the word 'may' *clearly* connotes discretion."  *Biden v. Texas*, 597 U.S. 785, 802 (2022) (citation modified); *accord Yoo v. United States*, 43 F.4th 64, 72 (2d Cir. 2022) ("The use of the word 'may' -- in contrast to words like 'shall' or 'must' -- authorizes, rather than commands.").  The plain meaning of § 342, therefore, is that Reserve Banks have the authority to grant a master account, but are not statutorily required to do so.

In fact, more than a century ago, the Supreme Court interpreted this exact statutory language in § 342 as "words of authorization merely."  *Farmers' & Merchs.' Bank of Monroe, N.C. v. Fed. Rsrv. Bank of Richmond, Va.*, 262 U.S. 649, 662 (1923).  In construing "may" to confer discretionary authority, the Court in *Farmers' & Merchants'* underscored that "neither [§ 342], nor any other provision of the Federal Reserve Act, imposes upon [R]eserve [B]anks any obligation" to exercise the powers delineated in the predecessor of § 342.  *Id.*  This was reinforced, the Court reasoned, by the fact that "[t]hroughout the [FRA] the distinction is clearly made between what . . . the Reserve Banks 'shall' do and what they 'may' do."  *Id.* at 663.

Nearly sixty years after *Farmers' & Merchants'*, Congress reconfirmed the Reserve Banks' discretion over accounts through the MCA. As part of that legislation, Congress amended § 342 to expand Reserve Banks' authority to receive deposits from "other depository institutions," but notably did not modify the "may receive " language, thereby implicitly adopting the Court's decades-old interpretation of that language as permissive. *See Tex. Dept's of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project*, 576 U.S. 519, 536-37 (2015) (adopting similar logic regarding the Fair Housing Act); *see also Lorillard v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of . . . [a] judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.").

The discretionary nature of the authority conferred by § 342 was most recently confirmed in 2022, when Congress adopted an amendment to the FRA known as the Toomey Amendment. National Defense Authorization Act for Fiscal Year 2023, Pub. L. No. 117-263, 136 Stat. 2395 (2022). The Toomey Amendment, titled "Master account and services database," requires the Board to create a public online database listing every entity that has submitted a master account request, classifying the entity as one of three types of depository

institutions, and indicating whether its master account request was "approved, *rejected*, pending, or withdrawn . . . ." 12 U.S.C. § 248c(b)(1)(B)(ii) (emphasis added).

The Toomey Amendment expressly contemplates the ability of Reserve Banks to "reject[]" access requests.[18] Notably, the three classification categories listed in the amendment -- insured depository institutions, insured credit unions, and depository institutions that are neither of the former two categories -- are all eligible to receive master accounts under the FRA. Accordingly, the text of the Toomey Amendment confirms that Reserve Banks are not *required* to accept all access requests from statutorily eligible applicants, and can in fact "reject[]" them.

BSJI presses us to read § 342 as merely restricting the types of currency a Reserve Bank can accept, noting that the provision states that Reserve Banks "may receive . . . *deposits of current funds in lawful money, national-bank*

---

[18] BSJI points to an amicus brief that Senator Toomey filed in *Custodia Bank*, in which he frames the amendment as a transparency law that does not otherwise recognize or authorize any discretion by Reserve Banks. But a sponsor's post-hoc statement of intent does not overcome the plain text of the enacted statute. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 653 (2020) ("When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest."); *Quarles v. St. Clair*, 711 F.2d 691, 705 (5th Cir. 1983) ("[I]t is well accepted that even explicit post-enactment, retrospective, statements of intent are to be looked upon with caution.").

*notes, Federal reserve notes, or checks . . . .*" *Id.* § 342 (emphasis added). But even so, § 342 still delineates the types of institutions from which Reserve Banks "may receive" those forms of currency. And the fact that Congress's single amendment to § 342 in the MCA was to add "other depository institutions" reinforces the view that the gravamen of the section is delineating the types of institutions that are eligible for a master account. *See* Pub. L. No. 96-221, § 105(a)(1), 94 Stat. 132, 139 (1980), *codified at* 12 U.S.C. § 342.

We therefore conclude that the text of § 342 unambiguously confers to Reserve Banks the authority to control access to its master accounts, and that this authority is discretionary.

B.      *Section 248a*

BSJI argues that § 248a overrides whatever authority is conferred by § 342, and instead creates a statutory entitlement to a master account on behalf of any eligible applicant institution. We disagree, concluding that the phrase "shall be available" in § 248a cannot bear the weight that BSJI places on those words.

Beginning again with the statutory text, § 248a is silent as to who governs master accounts or what types of institutions are eligible to receive one. Instead, § 248a -- which is expressly directed at the *Board*, rather than at Reserve

- 31 -

Banks -- outlines the process for setting a fee schedule for Fed services that had been free to member banks prior to the MCA. *See* 12 U.S.C. § 248a(a) ("*[T]he Board* shall publish . . . a proposed schedule of fees . . . ." (emphasis added)). As part of this process, § 248a(c)(2) requires that "all Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks . . . ." *Id.* § 248a(c)(2). Section 248a(c)(2) is therefore best read as a non-discrimination requirement: When the Board sets its fee schedule, it may not exclude nonmember banks from the schedule or price-discriminate between member and nonmember banks. But this requirement does not create an *entitlement* to those services.

Moreover, the phrase "nonmember depository institutions" refers to the *class* of entities, rather than to every individual entity within the class. Section 248a(c)(2) speaks of "nonmember depository institutions" in relation to "member banks," requiring that Reserve Bank services "shall be available to *nonmember depository institutions*" and "shall be priced at the same fee schedule applicable to *member banks*," and that "*nonmembers*" shall be subject to the same reserve and other requirements that are applicable to "*member banks*." 12 U.S.C.

- 32 -

§ 248a(c)(2) (emphases added).  In comparing and contrasting these two classes

of institutions, § 248a(c)(2) does not confer a statutory right to each and every

individual nonmember bank.

Tellingly, Congress can and did modify neighboring terms with

"all," but did *not* include it before "nonmember depository institutions."  For

example, § 248a(e) states that "*[a]ll* depository institutions" may receive deposits

from any number of other institutions or Reserve Banks, referring to "all" entities

within the class of depository institutions.  *Id.* § 248a(e) (emphasis added).  And

earlier in the same sub-section on which BSJI relies, Congress specified that "*[a]ll*

Federal Reserve bank services . . . shall be available to nonmember depository

institutions . . . ."  *Id.* § 248a(c)(2) (emphasis added).  We therefore decline BSJI's

invitation to read an additional "all" into § 248a(c)(2) where it was not penned by

Congress, especially when this discrepancy in phrasing occurs in the same

section and, indeed, "in the same sentence."  *DHS v. MacLean,* 574 U.S. 383, 392

(2015); *see also Barnhart v. Sigmon Coal Co.,* 534 U.S. 438, 452 (2002) ("[W]hen

Congress includes particular language in one section of a statute but omits it in

another section of the same Act, it is generally presumed that Congress acts

intentionally and purposely in the disparate inclusion or exclusion." (citation modified)).

Finally, nothing in § 248a(c)(2) abrogates the discretionary mandate Congress previously conferred to Reserve Banks through § 342. To be sure, the MCA meaningfully altered the cost and accessibility of the Fed's payment services, including by expressly permitting Reserve Banks to accept deposits from nonmember banks through an amendment to § 342. But Congress does not "hide elephants in mouseholes" -- that is, it does not "alter the fundamental details" of an existing scheme through "vague terms or ancillary provisions." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Accordingly, we are unpersuaded that a single phrase in a sub-section of an amendment titled "Pricing of services" and directed at the Board upends decades of Reserve Bank authority over account access as codified by the FRA, interpreted by the Supreme Court, and unaltered by the MCA decades later. To the extent BSJI asks us to conclude that § 248a(c)(2) impliedly overruled the discretionary regime that had existed for the prior seven decades, we are loath to do so "absent a clearly expressed congressional intention." *Branch v. Smith*, 538 U.S. 254, 273 (2003) (citation modified). Section 248a(c)(2) provides no such clear expression here.

- 34 -

## C.    *Statutory Structure*

Our conclusion that § 248a(c)(2) does not disturb the discretionary authority conferred by § 342 is also supported by the "broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).

To begin, § 342 is located in the subchapter of the FRA titled "Powers and Duties of Federal Reserve Banks." Sensibly, then, its text is directed at the Reserve Banks, stating that they "may receive" deposits from member banks or other depository institutions. In comparison, § 248a is located in the subchapter of the FRA titled "Board of Governors of the Federal Reserve System." Its various commands are therefore unsurprisingly directed at the Board, rather than at Reserve Banks. *See, e.g.,* 12 U.S.C. § 248a(a) ("[T]he Board shall publish for public comment a set of pricing principles . . . ."); *id.* ("[T]he Board shall begin to put into effect a schedule of fees . . . ."); *id.* § 248a(d) ("The Board shall require reductions in the operating budgets of the Federal Reserve [B]anks . . . .").

Next, placing § 248a(c)(2)'s "shall be available" language in the context in which it is used, the sub-section is best read as a pricing principle, rather than an account access mandate. To begin, § 248a(c)(2) is located in a section titled "Pricing of services," and a sub-section titled "Criteria applicable."

- 35 -

*Id.* § 248a(c); *see Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366, 380 (2018) ("Although section headings cannot limit the plain meaning of a statutory text, they supply cues as to what Congress intended." (citation modified)); *INS v. Nat'l Ctr. for Immigrants' Rts., Inc.*, 502 U.S. 183, 189 (1991) ("[T]he title of a statute or section can aid in resolving an ambiguity in the legislation's text."). Unsurprisingly, the other criteria listed in § 248a(c) all refer to the Board's authority over the pricing of services, rather than the Reserve Banks' authority over access to those services. *See* 12 U.S.C. §§ 248a(c)(1) (requiring that "services covered by the fee schedule shall be priced explicitly"); (c)(3) (requiring that fees be based on cost of services, including interest, overhead, and other costs); (c)(4) (setting the operative interest rate for credited services). Sub-section (c)(2) -- which requires that all Fed services "covered by the fee schedule shall be available to nonmember depository institutions" -- is properly read as another pricing criterion. *Id.* § 248a(c)(2); *see Yates v. United States*, 574 U.S. 528, 543-44 (2015) (reasoning that items in a list should be understood in a manner consistent with surrounding terms).

Moreover, the "broader statutory context" evinces § 248a(c)(2)'s purpose of preventing discrimination against nonmember banks as a class

- 36 -

following the MCA's allowance of such institutions into the Fed system. *MSP Recovery Claims*, 66 F.4th at 86.[19]  As detailed above, the MCA was a response to concerns about the Fed's membership crisis and anti-competitive behavior vis-à-vis private payment providers.  The MCA's two-part solution was to allow nonmember banks to access Fed services subject to them meeting the Fed's reserve requirement, but to charge for the services to cover cost of provision and to compete in the private market.

Section 248a was therefore critical in the MCA's restructuring of the Fed's operations, as it dictated the terms by which the Board was to establish the then-new pricing schedule for Fed services.  And among those terms, § 248a(c)(2) ensured that the pricing schedule would not discriminate against newly eligible nonmember banks.  But § 248a(c)(2)'s protection of nonmember banks from the Board's decisions with regard to *pricing* does not abrogate the Reserve Banks' authority with regard to *access.*  Moreover, giving effect to § 248a(c)(2)'s

---

[19]     BSJI points us to legislative history of the MCA describing the statute as "open[ing] access to [Federal Reserve] services to all depository institutions on the same terms and conditions of Master Banks."  BSJI Br. at 38 (citing 126 Cong. Rec. 6250 (1980) (Conf. Rep.)).  To the extent we consider such evidence in discerning the meaning of statutory text, there is nothing incongruous about the purpose of the MCA being to open Fed services to nonmember banks in general, and the fact that Congress did not make that access automatic and nondiscretionary as to every nonmember bank.

protection of nonmember banks as a class does not preclude Reserve Banks from allowing or denying any specific nonmember bank's access request. At bottom, the fact that Reserve Banks *may* grant master accounts to nonmember banks post-MCA does not mean they *must* grant such access to every eligible nonmember bank.

\*       \*       \*

We conclude that 12 U.S.C. § 342 grants Reserve Banks discretionary authority over master account access, and that this authority is undisturbed by the pricing principles enacted in § 248a(c). In so holding, we join the Tenth Circuit and every district court to address this question. *See Custodia Bank, Inc. v. Fed. Rsrv. Bd. of Governors*, 157 F.4th 1235 (10th Cir. 2025); *Fourth Corner*, 154 F. Supp. 3d 1185, *vacated*, 861 F.3d 1052 (10th Cir. 2017) (per curiam);[20] *PayServices Bank v. Fed. Rsrv. Bank of S.F.*, No. 1:23-CV-00305-REP, 2024 WL 1347094 (D. Idaho Mar. 30, 2024), *appeal filed*, No. 24-2355 (9th Cir.).[21]

---

[20]     On appeal, each member of the *Fourth Corner* panel wrote separately. Only Judge Bacharach would have reached the merits and reversed on the operative question here by concluding that § 248a(c)(2) created a statutory right to a master account. *See Fourth Corner*, 861 F.3d at 1064-80 (Bacharach, *J.*).

[21]     BSJI's reliance on *Greater Buffalo Press, Inc. v. Federal Reserve Bank of New York*, a 1989 decision from our Court, is misplaced. *Greater Buffalo* mentioned in its background

BSJI argues that the FRBNY terminated its Master Account as part of a campaign to de-bank "disfavored bank models." BSJI Br. at 23. It may be that Reserve Banks did not terminate or deny master account access until recent years.[22] But Reserve Banks have claimed the authority to limit master account access since master accounts were first introduced nearly 30 years ago. *See* OC 1 (1998) ¶ 2.3 ("All master accounts are subject to Reserve Bank approval."); *id.* ¶ 2.8 ("[The Reserve Bank] may close your master account . . . at any time . . . ."). And Reserve Banks presumably also were not, until recently, faced with requests from novel types of banking institutions that, such as BSJI, operate without any federal supervision or insurance.

As our Court has previously observed, Reserve Banks "operate in the public interest" and "in furtherance of [the Fed's] functions of . . . promoting

description of the Fed that, after the MCA, "check clearing services were now to be made available to all banks, regardless of whether or not they were member banks." *Greater Buffalo Press, Inc. v. Fed. Rsrv. Bank of N.Y.*, 866 F.2d 38, 40 (2d Cir. 1989). This language does not hold that BSJI had a "nondiscretionary right to a master account," BSJI Br. at 47, especially because the case did not even discuss § 342 or § 248a. If anything, the language instructing that services are "to be made available" to all instead supports reading the MCA as extending access to Fed services to nonmember banks as a class.

[22] The Reserve Banks' history of denying master account requests was not a matter of public record until the passage of the Toomey Amendment, which only requires the Fed to publish the status of access requests submitted *after* its enactment in 2022. *See* 12 U.S.C. § 248c(b)(1)(B).

the stability of the financial system." *Kraus*, 943 F.3d at 600 (citation modified).

To perform that function, Congress gave Reserve Banks a toolkit of scalpels and a hatchet. Against member banks, Reserve Banks have a myriad of precise and targeted powers -- including supervision, investigation, and enforcement authority -- through which they can surgically manage risk. But against nonmember banks, their primary power is the blunt instrument of allowing or disallowing access to the Fed's payment system. Interpreting the FRA's text as requiring that Reserve Banks grant master account access to every nonmember institution without question -- regardless of the safety and soundness risk it might pose -- would plainly undermine their ability to use their statutorily-conferred authorities to "promot[e] the stability of the financial system." *Id*. The FRA creates no such rule.

## II.    *Claims Against the Board*

Apart from the deficiencies in BSJI's statutory argument, its claims against the Board also suffer from a fundamental defect in the form of Article III standing. We agree with the district court that BSJI has not shown that its

- 40 -

alleged injury is "fairly traceable to [the Board's] allegedly unlawful conduct." *Allen v. Wright*, 468 U.S. 737, 751 (1984).[23]

To establish standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).  To survive a motion to dismiss based on Rule 12(b)(1), "the complaint's factual allegations of standing must be plausible and nonconclusory," and "the plaintiff must clearly allege facts in his complaint demonstrating each element of standing." *Lugo v. City of Troy*, 114 F.4th 80, 87 (2d Cir. 2024) (citation modified).

To meet the causation requirement, the alleged injury must be "fairly traceable to the challenged conduct of the defendant." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  The defendant's conduct may be an "indirect[]" cause of the injury, and the traceability inquiry "imposes a standard lower than proximate cause." *Rothstein v. UBS AG*, 708 F.3d 82, 91-92 (2d Cir. 2013).  But a plaintiff

---

[23] Because we conclude that BSJI has failed to establish the causation element of constitutional standing, we need not address the district court's additional conclusion as to redressability.

must still establish that the alleged injury was a result of "the challenged action of the defendant," rather than the "the result of the independent action of some third party." *Lujan*, 504 U.S. at 560 (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-42 (1976) (citation modified)). If the alleged injury results from the "independent decisions" of a third party, that would "break the chain of causation between the plaintiffs' injury and the challenged Government action" for purposes of establishing standing. *Allen*, 468 U.S. at 759.

BSJI's claims against the Board fail in this respect, because the FRBNY is an entity whose "independent decisions" caused the injury alleged here -- the closure of BSJI's Master Account. According to the factual record before us, the Board was involved only at two points: (i) issuing the August 2022 Guidelines and January 2023 S-Letter and (ii) replying that it "ha[d] no concerns with" the FRBNY's moving forward with closing BSJI's Master Account after the FRBNY informed the Board of its decision to do so. Conf. App'x at 1294. Neither action satisfies the traceability requirement because the Board does not exercise control over the FRBNY's access decisions with regard to any master account. Indeed, it likely has no statutory authority to do so.

Like all Reserve Banks, the FRBNY operates under the Board's "general supervision." 12 U.S.C. § 248(j). BSJI contends that this means the FRBNY "can exercise only the authority that has been delegated to it by the Board." BSJI Br. at 59. But nowhere in the FRA does it state that the Board must delegate the power to regulate master accounts to Reserve Banks. Instead, that authority is given directly to Reserve Banks by § 342, which is located in the chapter of the FRA titled "Powers and Duties of Federal Reserve Banks." 12 U.S.C. § 342; *see also id.* § 341 (granting Reserve Banks "all powers specifically granted by the provisions of this chapter").

By contrast, the Board wields no authority to open, close, or set the terms for accessing a master account. This is so based on the text of the statute and as confirmed by subsequent actions by the Board itself, such as the issuance of S-2677, which directs Reserve Banks to consult with the Board while expressly recognizing "the discretion granted to the Reserve Banks under section 13 of the Federal Reserve Act" to close an existing master account. Conf. App'x at 1651. Indeed, the Board is not even a contractual party to the MAA or OC 1, which reiterates the *Reserve Bank's* authority to close an account.

- 43 -

Accordingly, we reject BSJI's argument that the Board had the "opportunity and power" to prevent the FRBNY from terminating BSJI's Master Account. BSJI Br. at 60. Because the FRBNY's decision to do so was an "independent" one, its action "break[s] the chain of causation" such that BSJI fails to establish causation, and therefore standing, as to the Board. *Allen*, 468 U.S. at 759.

### III.    *Federal Law Claims Against the FRBNY*

Each of BSJI's federal law claims against the FRBNY rests on the premise that the FRBNY had a nondiscretionary obligation to provide it with access to a master account. Because the FRA creates no such obligation, the district court properly dismissed these claims under the relevant statutory and constitutional provisions.

### A.    *Administrative Procedure Act*

Although there is typically a strong presumption in favor of judicial review of an administrative action, the APA also contains express jurisdictional carveouts from review. Below, the district court dismissed BSJI's APA claim against the FRBNY for lack of jurisdiction, reasoning that, first, it was not an "agency" within the meaning of the APA, and second, even if it was, its

- 44 -

termination of BSJI's Master Account was "committed to agency discretion by law." *See Banco San Juan Internacional*, 762 F. Supp. 3d at 274-79 (quoting, *inter alia*, 5 U.S.C. § 701(a)(2)). We assume without deciding that the FRBNY is an agency for purposes of APA review, and affirm the dismissal because the FRA provides "no meaningful standard against which to judge the [FRBNY's] exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

The APA expressly precludes judicial review of agency actions that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *see Salazar v. King*, 822 F.3d 61, 76 (2d Cir. 2016). This exception is drawn narrowly and "is applicable in those rare instances where statutes are drawn in such broad terms" that there is "no law to apply." *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 410 (1971) (citation modified). The party challenging the agency decision bears the burden of establishing the "law to apply," *see Lunney v. United States*, 319 F.3d 550, 559 (2d Cir. 2003), which can be found in "the statutory text, the agency's regulations, and informal agency guidance that govern the agency's challenged action," *Salazar*, 822 F.3d at 76.

This is a case where Congress has not provided us with any "law to apply." The governing statute, 12 U.S.C. § 342, states only that Reserve Banks

"may" accept deposits from eligible institutions. 12 U.S.C. § 342. As we have explained, whereas we have previously held that statutory use of the word "shall" creates "mandatory, non-discretionary . . . requirements for agency action and shows that Congress has not left the decision . . . to the discretion of the agency," there is no such "mandatory command" here. *See Salazar*, 822 F.3d at 77.

Even if we expand our inquiry to consider regulations and guidelines issued by the Board, those likewise do not "contain meaningful standards constraining [the FRBNY's] discretion and providing for judicial review." *Westchester v. U.S. Dep't of Hous. & Urb. Dev.*, 778 F.3d 412, 422 (2d Cir. 2015). Principles 4 and 5 of the August 2022 Guidelines, which direct the Reserve Banks to "not create undue risk to the stability of the U.S. financial system" or "the overall economy," respectively, do not articulate judicially enforceable standards and instead reiterate that "decisions regarding individual access requests remain at the discretion of the individual Reserve Banks." 87 Fed. Reg. 51099, 51106. And S-Letter 2677, which directs Reserve Banks to consult with the Board before issuing an account to a Tier 3 institution, also expressly recognizes "the discretion granted to the Reserve Banks . . . to grant or deny access requests." Conf. App'x at 1651.

BSJI has not pointed to sufficient "law to apply" in assessing the propriety of the FRBNY's discretionary act of closure. Accordingly, we conclude that, assuming the FRBNY is an agency for purposes of the APA, its termination of BSJI's Master Account was nonetheless "committed to [its] discretion by law" and therefore not subject to judicial review. 5 U.S.C. § 701(a)(2).

**B.** ***Mandamus Act, Declaratory Judgment Act, and Due Process Claims***

BSJI addresses its remaining federal claims against the FRBNY in a single sentence of its brief, arguing that "the district court erred in dismissing [its] APA, Mandamus Act, Due Process, and declaratory judgment claims" because each decision "turned on [the district court's] mistaken interpretation" of the FRA. BSJI Br. at 47. Such "perfunctory" treatment of these issues, "unaccompanied by some effort at developed argumentation," results in the abandonment of these challenges. *United States v. Botti*, 711 F.3d 299 (2d Cir. 2013) (citation modified).

Even if BSJI had not abandoned its challenges to the dismissal of its non-APA federal claims, its Mandamus Act and Due Process challenges would fail because they depend on the presence of a nondiscretionary obligation on the part of the FRBNY, which, as discussed above, does not exist here. *See Pittston*

*Coal Grp. v. Sebben*, 488 U.S. 105, 121 (1988) ("The extraordinary remedy of

mandamus under 28 U.S.C. § 1361 will issue only to compel the performance of a

clear nondiscretionary duty" (citation modified)); *Town of Castle Rock v. Gonzales*,

545 U.S. 748, 756 (2005) (holding that a government benefit is "not a protected

entitlement" for purposes of supporting a Due Process claim if "officials may

grant or deny it in their discretion").  Moreover, § 248a does not authorize the

right of action needed to support BSJI's DJA and Due Process claims.  *See* 12

U.S.C. § 504 (containing no statutory private right of action); *cf. Adato v. Kagan*,

599 F.2d 1111 (2d Cir. 1979) (holding that there is no implied right of action

under § 11(m) of the FRA); *see also Chevron Corp. v. Naranjo,* 667 F.3d 232, 244 (2d

Cir. 2012) ("The DJA is procedural only, and does not create an independent

cause of action" (citation modified)); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 69-

70 (2001) (reasoning that *Bivens*'s recognition of an implied cause of action under

the Due Process clause does not extend to suits against federal *agencies*).

## IV.     *State-Law Claims Against the FRBNY*

BSJI also brought two state-law contract claims against the FRBNY:

(1) breach of the contractual duty of care, and (2) breach of the implied covenant

- 48 -

of good faith and fair dealing. Both claims were correctly dismissed as a matter of law.

BSJI's contract claims begin and end with Section 2.10 of OC 1, which is incorporated by the MAA and governed by New York law. Section 2.10 states that the FRBNY can terminate BSJI's Master Account "at any time by notice." Conf. App'x at 1583. This termination right was subsequently reinforced by Article 3 of the Supplemental Terms, which states that "the Bank may suspend or terminate [BSJI's] access" or "close [BSJI's] Master Account [or] impose conditions . . . at any time by giving written notice to [BSJI.]" *Id.* at 1602. These provisions create an "absolute, unqualified right to terminate" the account that, under New York law, must be given effect without judicial inquiry into whether the right was "activated by an ulterior motive." *See Big Apple Car, Inc. v. City of New York*, 204 A.D.2d 109, 111 (1st Dep't 1994); *Watermelons Plus, Inc. v. N.Y.C. Dep't of Educ.*, 76 A.D.3d 973, 974 (2d Dep't 2010) (collecting cases); *In Touch Concepts, Inc. v. Cellco P'ship*, 949 F. Supp. 2d 447, 470 (S.D.N.Y. 2013).

BSJI instead asserts that Section 7.1 of OC 1 creates a duty of care that the FRBNY breached when it terminated BSJI's Master Account. But Section

7.1 does not impose a duty of care on the FRBNY independent of its existing

obligations as a provider of payment services. The provision states:

> [A] Reserve Bank shall be liable only to an Account Holder and only for actual damages incurred by the Account Holder and proximately caused by the Reserve Bank's lack of good faith and failure to exercise ordinary care. A Reserve Bank is not liable for lost profits, claims by third parties, or consequential or incidental damages, even if the Reserve Bank has been informed of the possibility of such damages.

Conf. App'x at 1590.

Read in full and in context, Section 7.1's reference to "good faith" and

"ordinary care" is clearly with regard to damages that may be incurred due to

commercial acts that the FRBNY undertakes as a payment processor. *See Banco*

*San Juan Internacional*, 762 F. Supp. 3d at 284 (noting that Section 7.1 might apply

to suits brought if the FRBNY "messe[d] up check clearing" (citation modified));

FRBNY Br. at 53 (noting that Section 7.1 might limit liability where the

FRBNY "experiences a delay in processing a check for a financial institution").

Even in those cases, Section 7.1 *limits* the FRBNY's liability to "actual damages

incurred" and "proximately caused by [its] lack of good faith and failure to

exercise ordinary care." Conf. App'x at 1590. Section 7.1 therefore "does not . . .

impose upon the FRBNY a generalized duty of care above and beyond" any

- 50 -

existing obligation owed to BSJI.  *Banco San Juan Internacional*, 762 F. Supp. 3d at 284.  More importantly, Section 7.1 does not otherwise overcome the express right to terminate a master account that is codified earlier in the same contractual agreement.

BSJI's good faith and fair dealing claim also fails.  Under New York law, implied covenants do not limit a party's discretion to exercise an express termination right, as courts "do not ordinarily read implied limitations into unambiguously worded contractual provisions designed to protect contracting parties."  *Moran v. Erk*, 11 N.Y.3d 452, 456 (2008).  Moreover, New York law "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled."  *Harris v. Provident Life and Acc. Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002).  The district court therefore properly dismissed BSJI's good faith and fair dealing claim as duplicative of its breach of contract claim.

## V. *Denial of Leave to Amend*

Finally, BSJI challenges the district court's decision denying it leave to add a Fifth Amendment Equal Protection claim against the FRBNY based on purported discrimination on the basis of national origin because BSJI's is wholly

owned by a Venezuelan national. "Proposed amendments are futile if they would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6)." *Thea v. Kleinhandler*, 807 F.3d 492, 496-97 (2d Cir. 2015) (citation modified). In evaluating futility, we consider the proposed amendments and original complaint, accepting all non-conclusory factual allegations as true and drawing all reasonable inferences in favor of the plaintiff. *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 225 (2d Cir. 2017).

"While the Fifth Amendment contains no [E]qual [P]rotection clause, it does forbid discrimination that is so unjustifiable as to be violative of due process" such that our "approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment." *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975) (citation modified). For a Fifth Amendment Equal Protection claim to survive a motion to dismiss, a plaintiff must "plead sufficient factual matter to show" that defendants "implemented the [policy] at issue not for a neutral, investigative reason but for the purpose of discriminating on account of . . . national origin." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).

As a threshold matter, BSJI's Equal Protection claim suffers from the same infirmity as its Due Process claim in that there is no right of action available under *Bivens* or otherwise. *See Malesko*, 534 U.S. at 69-70. Even if there were, the proposed amendment fails to state a claim because BSJI has failed to "plead and prove that [the FRBNY] acted with [a] discriminatory purpose" in closing its Master Account. *See Iqbal*, 556 U.S. at 676.

BSJI alleges that 9 of 10 IBEs owned by Venezuelan nationals have had their master accounts terminated in the last five years. It also alleges that the FRBNY issued an "internal directive" in 2019 to reject all future access requests from IBEs. Conf. App'x at 1872 ¶ 155 (Proposed Second Amended Complaint). But the only source cited for this allegation is a Reuters article reporting, based on "four sources and a document seen by Reuters," that the FRBNY had issued a letter stating it would halt approval of IBEs "in light of recent events, including the expansion of U.S. economic sanctions relating to Venezuela." *Id.* at 1830 ¶ 14 & n.1 (citing Luc Cohen & Corina Pons, *Exclusive: New York Fed Cracks Down on Puerto Rico Banks Following Venezuela Sanctions*, Reuters (Apr. 18, 2019), https://www.reuters.com/article/ business/exclusive-new-york-fed-cracks-down-

on-puerto-rico-banks-following-venezuela-san-idUSKCN1RU2EH/

[https://perma.cc/LW3Y-YB8S]).

BSJI's allegation that Reserve Banks have terminated the master accounts of 9 of 10 Venezuelan-owned IBEs, even if true, cannot sustain an Equal Protection claim without "additional evidence of discriminatory animus." *Brown v. City of Oneonta, N.Y.*, 221 F.3d 329, 338 (2d Cir. 2000); *see Washington v. Davis*, 426 U.S. 229, 239 (1976) (holding that a government act is not unconstitutional "[s]olely because it has a . . . disproportionate impact" and "without regard to whether it reflects racially discriminatory purpose"). And the Reuters article falls short of suggesting that the FRBNY's decision to terminate BSJI's account was based on animus, instead noting documented, nondiscriminatory concerns about money laundering and sanctions evasion. *See* Cohen & Pons, *Exclusive: New York Fed Cracks Down on Puerto Rico Banks Following Venezuela Sanctions* (noting "the role Puerto Rico's offshore banks have played in efforts to launder Venezuelan funds through the United States" and that the FBI had raided BSJI "as part of a probe of money laundering and evasion of Venezuela-related sanctions"). Accordingly, even accepting all of BSJI's assertions as true, they do not plausibly

- 54 -

allege that the FRBNY acted with discriminatory purpose in terminating BSJI's

Master Account.

## *CONCLUSION*

For the foregoing reasons, the judgment of the district court is

AFFIRMED.